Filed 11/20/13  P. v. Revill CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B233987 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA040683) |
| v. | |
| NEIL REVILL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed.

Donald R. Tickle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, Joseph P. Lee and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Neil Revill, appeals his conviction for first degree murder with a multiple victims special circumstance, second degree murder, and transporting a controlled substance (two counts). (Pen. Code, §§ 187, 190.2, subd. (a)(3); Health & Saf. Code, § 11379.)[1] He was sentenced to state prison for a term of life without possibility of parole.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

    a. *Arrests of Davodian and Revill.*

On June 13, 2001,[2] Glendale police arrested Arthur Davodian while in possession of narcotics and drug trafficking paraphernalia. That evening, Davodian agreed to act as an informant when police officials promised him leniency if he gave them three other drug trafficking cases. Accordingly, Davodian telephoned defendant Revill and asked him to deliver narcotics to a specific location in Glendale. Davodian told police Revill was a white male who would be driving a white BMW.

Later the same night, Glendale Police Officer Michael Stilton, having been alerted to this information, stopped Revill for speeding as he was traveling to the designated delivery spot. Inside the BMW, Stilton found a .45 caliber semiautomatic handgun loaded with hollow-point ammunition, a plastic Ziploc bag containing marijuana, a digital scale, and 66 empty plastic baggies. Under the rear floor mat, Stilton found 64 tablets of MDMA (also known as "Ecstasy") in a Ziploc bag. At the police station, Revill was also discovered to be in possession of 13.5 grams of methamphetamine.

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     All further date references are to the year 2001 unless otherwise specified.

After being released from custody, Revill told an acquaintance, Jonathan Bloomquist, that "it was a little funny . . . how he showed up there and then they arrested him." Revill said "something smelled funny, something is not right," and he felt he had been "set up."

b. *Davodian moves in with Gregorian.*

In the fall of 2001, Michael Gregorian was addicted to methamphetamine. He invited his drug dealer, Arthur Davodian, to move into his Tujunga apartment in exchange for a month's rent. Davodian moved in and essentially took over the apartment. He occupied the master bedroom and put a dead bolt on the bedroom door without giving Gregorian a key. Davodian's girlfriend, Kimberley C., and her 18-month-old daughter Kaylee also moved in, which had not been part of Gregorian's offer. Gregorian moved into the smaller bedroom. Most of the people who visited Davodian at the apartment came to buy drugs. Gregorian no longer felt comfortable there and began staying away from the apartment for days at a time.

c. *The murders.*

On the night of October 10, Gregorian went to his apartment to party with some friends. Davodian, Kimberley and defendant Revill were in the master bedroom smoking methamphetamine, while Gregorian and his friends were in the living room. At one point Gregorian went into the master bedroom, purchased methamphetamine from Davodian, and paid him in cash. At another point, someone came by to purchase drugs and Davodian went outside to make the sale. Gregorian later went into the master bedroom to smoke methamphetamine with Davodian and Revill. At that time he did not see any abrasions on Revill's forehead, something he would have noticed.

Gregorian left between 2:00 and 2:30 a.m. and went to sleep at a friend's house. When he left, Revill was still in the master bedroom. Around 8:00 or 8:30 a.m. the next morning, Gregorian started calling his apartment because he wanted to check on what was going on. No one answered his calls.

After Gregorian got off work on October 11, he returned to his apartment, arriving sometime between 2:30 and 3:00 p.m. When he opened the door, he saw Davodian lying on the living room floor. He had been decapitated. The cord for the kitchen phone had been pulled out of the wall, and the door to the master bedroom had been kicked off its hinges. Inside the bedroom, Kimberley was dead on the floor. Her daughter Kaylee was in Gregorian's bedroom across the hall. Kaylee was crying, so Gregorian picked her up, plugged the phone back in and called 911. Paramedics arrived, followed by the police.

A week later, someone found Davodian's head, inside a plastic bag, lying in some bushes behind a wall about a block and a half from Gregorian's apartment.

### d. *Crime scene evidence.*

Gregory Stevens worked as a firefighter/paramedic. He and his partner in a rescue ambulance, along with a four-man fire engine company, responded to Gregorian's 911 call. Five of them went into Gregorian's apartment. Davodian's decapitated body was lying in the living room. A trail of blood led to the master bedroom where Kimberley's body was found. "The blood on and around [Kimberley] didn't appear to be very fresh blood. It was very dark in color, almost purple, congealed and largely dried." Kimberley's body showed both lividity and rigor mortis. Lividity, which is the tendency for blood in dead bodies to settle with gravity, begins about 30 minutes after death. Rigor mortis begins 60 to 90 minutes after death. Both Kimberley and Davodian had sustained multiple stab wounds and appeared to have lost most of their blood. There were blood streaks on the walls. Stevens testified the blood in the apartment "was mostly dried, and we noted that the carpets we were walking on were crunchy with dried blood."

Kimberley had sustained 19 knife wounds and Davodian a total of 18. Both of them had defensive wounds to their hands and arms. Davodian's head had been severed around the time of death. Judging by the wounds, a knife with a blade at least six inches long had been used. A large kitchen knife was missing from Gregorian's apartment. A knife sharpener usually kept in the kitchen was found on the toilet seat cover in the master bedroom.

4

The combination of blood spatter and transfer blood stains on the living room wall indicated there had been a violent struggle. A red stain from the couch contained a mixture of DNA from Revill and Kimberley. Underneath the fingernails of Kimberley's left hand there was a mixture of DNA from Kimberley and Revill. There was a bloodstain on the front of Kaylee's dress and a drop of blood in her hair. The bloodstain on her dress was consistent with blood having dripped from someone leaning over her, and DNA from this blood produced a single-source profile that matched Revill and excluded both Davodian and Kimberley. The random match probability that a person unrelated to Revill had deposited this DNA was one in 1.1 trillion Caucasians. The blood in Kaylee's hair contained a mixture of DNA; the primary profile matched Davodian, while Kimberley and Revill were excluded as secondary contributers. DNA from an unknown male was discovered in several places inside the apartment.

There was evidence someone had tried to clean up the crime scene. In the master bathroom, there was a soaking wet towel and a pink smear which appeared to consist of blood diluted by water. In the other bathroom, there were two wet shirts on the floor. On the kitchen counter there was a paper towel with an apparent bloody handprint. This paper towel contained a mixture of DNA from Davodian and Revill.

Kimberley's purse was found on a hanger inside the master bedroom closet. Her driver's license and some cosmetics were inside the purse, but no money. There was an open safe inside this closet. Inside the safe there was a water pipe, some baggies, receipts and a scale, but no drugs or money. There were no drugs or money anywhere in the apartment. The police could not find Davodian's wallet or driver's license.

e. *Revill's behavior on October 11 and 12*.

Between 11:00 a.m. and 1:00 p.m. on October 11, Revill called an acquaintance, Sorin Raceanu, to say he was stranded in the San Fernando Valley and needed a ride. Raceanu picked Revill up at a location in the Valley which was 20 driving miles from where the murders occurred. Revill was not bloody and his clothes were not torn, but he looked like he had been up all night. Because Revill owed Raceanu money, he gave him about $100 worth of methamphetamine. Police showed Raceanu photographs of Revill

5

taken on October 12, which depicted "scratches/injuries to [his] head." Raceanu said he had seen the same injuries when he picked Revill up on October 11.

According to Kara Horn and Ersen Tanitkan, two of Revill's friends, he was a heavy user of methamphetamine which he also sold. Having lost his regular job, he sometimes stayed at their apartment. Tanitkan testified he also knew Davodian as someone who sold drugs in the Hollywood underground club scene.

On the evening of October 12, Horn's birthday was celebrated with a party at a Hollywood restaurant. Revill came to the party dressed up in clothes and shoes that looked brand new. He had a roll of $20 bills and helped pay for dinner, which was unusual because "[h]e normally was broke."

Revill had visited with Horn and Tanitkan at their apartment right before the birthday party. Horn noticed there were fairly large scratches on Revill's forehead. When she had seen him on October 10 those marks were not there. When Horn asked about it, Revill said he had gotten into a fight with Davodian over a pair of sunglasses. Tanitkan testified there was a large scratch on Revill's forehead above his eye and parallel scratches on his forehead. He also had minor bruises and scratches on his arms, hands, shoulders, neck and forehead. Tanitkan had never seen these injuries before.

Revill, who was usually happy and energetic, was very quiet that evening. Before going to the restaurant, he became panicky and nervous, saying he had done something very bad. When Tanitkan asked what it was, Revill merely said it was very evil and indicated he did not want to talk about it. At another point, Revill asked to borrow Tanitkan's car so he could drive to Orange County, saying: "Orange County has the best jails. I need to be there. I need to go there."

While at the restaurant, someone told Horn about Davodian's murder. After leaving the restaurant, the group returned to Tanitkan and Horn's apartment. Because of the way Revill had been acting at dinner, the others wondered if he might have killed Davodian. At some point, Horn asked Revill, "Did you do it?" Revill told Tanitkan he had not committed the murders, that Davodian's killing "was a Mexican gang thing."

6

f. *Subsequent events*.

On Thanksgiving, November 22, Revill was visiting with Horn and Tanitkan at their apartment. Their friend Salim was there. Revill appeared to be high on drugs and he was acting weird. Horn had noticed in the last two months that he had been getting worse every day because of his drug use. Tanitkan described Revill as "really panicking. He was really nervous and anxious, kind of scared. Obviously, not a clear mind. He was sweating." Revill "was really high, and he was acting aggressive, and nothing that he said was rational. He was demanding things and being loud and very, very uncoordinated. Then he took it into the next level, yelling and cursing and screaming. He had a knife that he grabbed . . . and he started threatening [Salim and me] that he was going to kill us." "[T]hen he started saying that we were aliens, and he needed to kill us and take our souls and free our souls and then after he does that, he was going to kill [Horn]." Revill said "that if he kills us, he needed to kill [Horn] also."

Horn finally calmed Revill down and got him to leave. As soon as he was out of the apartment, Tanitkan called 911. The police responded and arrested Revill. Inside his new-looking leather Tumi travel bag, police found a Social Security card belonging to Kimberley's estranged husband. At trial, Kimberley's mother testified she and Kimberley had "discussed [this Social Security card while Kimberley] was filling out insurance papers for medical purposes."

g. *Revill's confession to Chloupek*.

Benjamin Chloupek, who was 47 years old at the time of trial, had been incarcerated for 18 years of his life. He had been convicted of involuntary manslaughter in the death of a child, commercial burglary, theft and possession of narcotics. He was incarcerated in Los Angeles County in 2003, 2005, and then from 2006-2008. Chloupek first met Revill in 2003 when they were housed in the same jail dormitory. Revill, who had a noticeable British accent, seemed to be a fish out of water and Chloupek, a prison veteran, took Revill under his wing. During 2007 and 2008 they occupied adjacent bunks in the same cell. Revill told Chloupek about the breakup of his marriage to an attorney,

7

his subsequent involvement in underground "after hours" clubs in Hollywood, and eventually becoming a drug dealer.

Revill initially told Chloupek the murders had been committed by the Israeli Mafia in a dispute over trafficking in the drug Ecstasy. Revill said that, on the night of the killings, Davodian invited him over to Gregorian's apartment to smoke methamphetamine. After Davodian and Kimberley went to bed, Revill left the apartment door unlocked so the Israelis could come in and kill Davodian. By doing this, Revill was clearing a debt he owed the Israelis.

Then, in the summer of 2007, Revill told Chloupek a different story. Revill said he had been selling large amounts of Ecstasy at after-hours clubs for the Israeli Mafia. After his 2001 Glendale drug arrest, they bailed him out of jail and hired a lawyer for him. One of the Israelis gave Revill money to buy cocaine from Revill's usual source, but the source stole the money. The Israelis began pressuring Revill for repayment. Revill wanted to get out of the drug business, so he introduced his friend Davodian to the Israelis hoping they would agree to let Davodian take over his franchise. The Israelis asked Revill to do one more transaction to clear his debts; they wanted him to take 20,000 Ecstasy pills to Baltimore by bus. However, Revill considered the plan too risky so he stopped taking their phone calls and went into hiding.

This was Revill's situation when he ran into Davodian the night of October 10. At Gregorian's apartment, Revill, Davodian and Kimberley took Ecstasy and methamphetamine. After Kimberley went to bed, Revill and Davodian continued to party. At some point the phone rang and Revill heard Davodian said, "I'll keep him here." Revill had been up for days and he was getting paranoid. He wanted to leave, but Davodian forcefully stopped him, saying: "No, you are going to stay with me. You are going to party. You are going to hang out." They scuffled and Revill thought "he was being held there for a reason." But then he calmed down and decided to stay. Later on, however, after Davodian took another phone call, Revill became "absolutely panicked that [he was] being kept there like the lamb for the slaughter." He thought the Israelis

8

were coming to exact revenge for the money he owed them and for refusing to transport the Ecstasy to Baltimore.

When Revill tried to leave the apartment at about 7:00 a.m., Davodian again tried to stop him. Revill "freaked out at that point and exploded." He and Davodian fought "for real this time, full all out." Revill was "scared out of his mind, didn't think he had a choice, thought he was being kept there . . . to be killed. And during that fight he pulled out his knife . . . ." He stabbed Davodian in the chest, then "[h]ad him in a headlock, choked him out, and stabbed him a few more times." Revill then heard Kaylee crying. Worried that Kimberley would wake up, he went to quiet the baby. While changing Kaylee's diaper, he got blood on her dress or blanket from a cut he had sustained during the struggle with Davodian.

After changing Kaylee's diaper, Revill returned to the living room and stabbed Davodian a few more times. Then he went to kill Kimberley "[b]ecause he couldn't leave [the apartment] being the last one there with a mess like that." He had to kick in the bedroom door. He stabbed Kimberley, but she fought back and "an extensive" struggle ensued. After killing Kimberley, Revill decided to cut off Davodian's head "[t]o take it so they would think he [i.e., the killer] was somebody else and they . . . were taking the head to I.D. it to some big Mafia guy that needed an I.D." Revill had to get a sharper knife from the kitchen because it was a difficult job. He "had to twist the head to tighten up the anatomy of the neck so it would cut," and "[t]he arteries disappeared down into the neck." There was blood all over the place. Revill changed into some of Davodian's clothes and cleaned up the apartment. He put Davodian's head into a canvas bag and took it with him, throwing it over a wall some blocks from Gregorian's apartment. Revill walked around for a while and then got a ride to Hollywood. A man who lived downstairs from Davodian's apartment had heard unusual noises later in the day, around 2:00 p.m. Revill said this man "would be a good witness because he had the times wrong."

9

2. *Defense evidence.*

Revill did not testify.

Yoram Katz was living below Gregorian's apartment at the time of the murders. About 2:00 p.m. on October 11, he was working at his desk in the living room when he heard "intensive footsteps . . . a lot of running, banging on the floor, maybe the walls." "[I]t sounded like more than one person was running." This noise continued for 10 minutes. Katz kept working and then he heard a big bang which sounded like it came from the master bedroom. Katz knocked on the ceiling with a broom. The noise continued for a minute or two, but then stopped after he heard two or three "very strong bangs . . . like somebody is breaking the wall or a door." The police arrived 30 or 45 minutes after the noise stopped.

3. *Trial proceedings.*

Revill was prosecuted on two counts of murder, two counts of transporting drugs, and one count of aggravated assault for the Thanksgiving knife incident. The jury could not reach a verdict on the assault charge, but convicted Revill on the other counts.

## CONTENTIONS

1. The trial court erred by refusing to disclose the identity of a confidential informant.

2. DNA evidence was admitted in violation of Revill's confrontation clause rights.

3. The trial court erred by denying Revill's severance motion.

4. The trial court erred by admitting evidence Revill believed his drug arrest had been a set up.

5. The trial court erred by excluding evidence Revill believed he would not be prosecuted on the drug charges.

6. The trial court erred by limiting cross-examination of a prosecution witness.

7. The trial court erred by admitting testimony about a knife found in Tanitkan's apartment.

10

8. The jury was misinstructed on the definition of reasonable doubt.

9. There was cumulative error.

**DISCUSSION**

1. *Trial court did not err by denying disclosure of confidential informant.*

Revill contends the trial court erred by denying disclosure of a confidential informant's identity. This claim is meritless.

Prior to trial, Revill moved for an order requiring the prosecution to disclose the identity of a confidential informant who had worked for the Drug Enforcement Administration (DEA). Revill alleged this informant had given the following information to the DEA about a drug network which had supplied Davodian with Ecstasy to sell in the summer and fall of 2001. Members of the network, which included Johnny Bloomquist and Eliyahu Amouyal, learned Davodian was acting as an informant. The network members had shown they were willing to use violence, which included soliciting the murder of suspected informants. Before he was killed, Davodian had been advised to get out of town. A member of the network who furnished information to the police had heard that another member killed Davodian and his girlfriend.

The prosecution acknowledged the DEA had used a confidential informant to investigate a drug network involving Amouyal and Bloomquist, and that this network had done business with Davodian. However, the prosecution argued disclosure of the confidential informant's identity was unwarranted because "[t]here is no credible evidence that the informant was percipient to the alleged murders, or that he even knew the defendant or victims. The murders of Davodian and [Kimberley] as well as Revill's name never appear in the numerous reports given to [the] defense . . . . According to the DEA reports, the informant's work with the drug traffickers pertained to transactions that were never linked to Revill or Davodian."

The trial court examined the confidential informant at an in camera hearing. Revill had submitted proposed questions, along with Davodian's driver's license, to see if the informant possessed any information relating to this case.

11

After the in camera hearing, the trial court announced its ruling: "After being placed under oath, I questioned that informant. And I want to emphasize something. I asked the People to present the informant in an abundance of caution. I never did make the finding that there was a reasonable possibility that he had exculpatory evidence in this case, but given the somewhat unusual nature of the case, I exercised my discretion . . . to question the informant. [¶] After questioning him under oath, I'm satisfied that he has no information that is pertinent to this case whatsoever, no exculpatory information and no information at all, and, therefore, his identity will not be disclosed."

On appeal, the parties agree the question whether access to the confidential informant's identity was properly denied should be resolved by having this court review the transcript of the in camera proceeding. This is the correct procedure. "[T]he prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant. [Citation.] An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant. [Citation.] The defendant bears the burden of adducing ' " 'some evidence' " ' on this score. [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 159-160.)

We have reviewed the sealed transcript of the in camera hearing. Based on that review, we conclude the trial court properly determined the confidential informant "could not have provided any evidence that, to a reasonable possibility, might have exonerated defendant." (*People v. Lawley, supra,* 27 Cal.4th at p. 160.)

2. *DNA evidence was properly admitted.*

Revill contends the trial court erred by allowing the admission of certain DNA evidence. This claim is meritless.

a. *Background.*

Relying on our Supreme Court's opinion in *People v. Geier* (2007) 41 Cal.4th 555, the prosecution initially intended to present its DNA evidence through the testimony of Dr. Robin Cotton. Although Cotton did not perform the DNA tests herself, she had

12

worked at Cellmark labs as a laboratory director and technical reviewer during the time the evidence from these two murders was tested.  However, the trial court concluded the then-recent case of *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [129. S.Ct. 2527], required testimony from the DNA analysts who had done the testing.

The prosecution subsequently located Juliet Rolando,[3] the DNA analyst who had performed many of the most critical tests in 2001 and 2002.  Rolando had left Cellmark in 2005 and was currently working at the FBI laboratory in Quantico, VA.  After Rolando informed the prosecution she was pregnant and scheduled for a cesarean section during trial, and that she had been advised air travel could be medically dangerous, the prosecution moved to take her conditional examination.[4]  The prosecution later submitted a declaration from Rolando's doctor attesting to the health risk.  Revill objected that this document, prepared in Virginia, was deficient because it failed to state it had been executed under penalty of perjury pursuant to the laws of California.[5]

The trial court overruled Revill's objection and conducted a conditional examination.  Rolando testified that, in her work as a DNA analyst, she took custody of

---

[3]    Rolando's name was Juliet Harris when this testing was done.

[4]    Section 1335 provides, in pertinent part:  "(b) When a defendant has been charged with a serious felony or in a case of domestic violence, the people or the defendant may, if the defendant has been fully informed of his or her right to counsel as provided by law, have a witness examined conditionally as prescribed in this chapter, if there is evidence that the life of the witness is in jeopardy."

[5]    Section 1336 prescribes the procedure for gaining the conditional examination of a witness "so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend trial," and requires that application for such an examination "shall be made upon affidavit."  Code of Civil Procedure section 2015.5 provides, in pertinent part, that an unsworn declaration may be substituted for a sworn affidavit if it "recites that it is certified or declared by him or her to be true under penalty of perjury, is subscribed by him or her, and (1), if executed within this state, states the date and place of execution, or (2), if executed at any place, within or without this state, states the date of execution and that it is so certified or declared under the laws of the State of California."

evidence, conducted DNA tests, interpreted the test results and wrote reports based on that testing. These reports were then peer-reviewed before submission to the client agency. Cotton had been Rolando's supervisor at Cellmark, and Cotton had technically reviewed some of the testing Rolando did in this case. Rolando testified certain DNA matches had been found in the evidence from this case. For instance, she testified DNA from Kaylee's dress had come from a single source which matched Revill's DNA profile, and that DNA found under Kimberley's fingernails contained Kimberley's profile as the primary source and Revill's profile as a secondary source. Rolando did not offer any random match probability testimony,[6] although those statistics do appear in the lab reports she prepared.

Peggy Rodriguez, another Cellmark DNA analyst, had done the testing on a red stain from the couch in Gregorian's apartment. She testified this sample contained a DNA mixture with Kimberley and Revill "as potential contributors to the mixture."

Dr. Robin Cotton testified she has a Ph.D. in molecular biology and biochemistry, and is currently a professor at Boston University School of Medicine, where she is the director of a master's degree program in forensic science. Cotton formerly worked at

---

[6]    Random match probability evidence refers to the odds of finding another person who shared the same DNA profile. "The genetic traits examined to create a DNA profile are regions or loci of highly variable and repetitive DNA. . . . Because a person inherits a set of chromosomes (22 plus an X or Y) from each parent, every genetic locus has two versions (alleles). For statistical analysis, the frequency with which each possible allele at each locus exists in various populations has been estimated through studies of population databases. From these tabulated frequencies, the frequency of a perpetrator's overall DNA profile can be estimated: the frequencies of the two alleles at every locus in a perpetrator's profile are all assigned, then multiplied together to obtain the frequency of the entire multilocus profile in the relevant population. This method is known as the 'product rule.' The resulting frequency (sometimes called the 'rarity statistic') can also be expressed as the probability that the profile of a person selected at random from the relevant population would match the perpetrator's profile. [Citations.] When, as in this case, the perpetrator's profile consists of 15 loci, the resulting statistics establish that the profile is astronomically rare and therefore that a suspect's possession of it is 'powerfully incriminating.' [Citation]." (*People v. Xiong* (2013) 215 Cal.App.4th 1259, 1270.)

14

Cellmark Labs for 18 years and during that time she worked with both Rolando and Grossweiler.

DNA testing involves a multi-step process. Suspected DNA material is first extracted from crime scene evidence, e.g., from a bloody weapon, and then "amplified," which is a method for generating copies of DNA fragments in order to provide sufficient material for testing. The amplified material is then "typed" by automated machinery that produces an electropherogram, which Rodriguez described as "a visual representation of the DNA that is present" in the sample. Cotton testified that after a DNA sample is copied many times, the test tube containing the sample is fed into "a rather sophisticated machine that separates out these fragments of DNA and allows you to visualize them, and ultimately you're visualizing them as a DNA profile, which is properly called an electropherogram . . . and then you have to interpret that information." "[W]hat the machine does is separate out the fragments that you've copied by how long they are. It allows you to visualize it . . . and when the machine prints out this graph, that graph is the profile. And after you look at that profile, you have to make some interpretation."

Cotton testified that, although she had not personally done any of the lab work in this case, she "did review . . . the work for some of these samples as a technical reviewer. I didn't do it all. There were other people that did some of the other technical review. And in preparation for coming to court today, I've reviewed pretty much everything."

Cotton testified the DNA found under Kimberley's fingernails had been tested at "all 13 loci" by using a combination of the Profiler Plus and COfiler testing kits. Cotton identified People's exhibit No. 192 as a table reflecting the result of the Profiler test kit on the fingernail evidence, and People's exhibit No. 193 as a table reflecting the COfiler test kit on the same fingernail evidence. Cotton explained how the data tables reflect the genetic profiles generated by the electropherogram, and how the numbers in those tables are interpreted in order to conclude that a DNA match has been established. Cotton testified the data from these tests showed: "The left hand fingernails have a DNA profile that is consistent with having two individuals as contributors. The primary contributor is

15

consistent with Kimberley . . . , which makes sense since those are her fingernails. The secondary contributor is consistent with Neil Revill."

Cotton then testified that, assuming the sample contained DNA from two people, one of whom was Kimberley, "what we did is we calculated . . . how often would you find another person who could be included as the secondary contributor. [¶] And those numbers are approximately one in 390 trillion African Americans, one in 42 trillion Caucasians, and one in . . . 105 trillion Hispanics." The prosecutor asked: "I just want to make sure that I understand what you are saying. . . . [T]he DNA you examined that was remaining after you excluded [Kimberley] was consistent with the defendant and . . . [¶] . . . [¶] . . . one in 42 trillion other Caucasians? [¶] A. Approximately one in 42 [trillion] Caucasians would also . . . have a profile that would be consistent with this secondary contributor."

Cotton testified she had looked at the data from the DNA testing on Kaylee's dress and, in her opinion, the sample had "produced a single source profile . . . and that . . . single source profile matched Neil Revill." Cotton testified the random match probability for another person to have been the source of that DNA was approximately "one in five trillion African Americans, one in 1.1 trillion Caucasians, and one in 52 trillion Hispanics . . . ."

b. *Discussion*.

On appeal, Revill contends his convictions must be reversed because the most crucial DNA results should never have been admitted into evidence. He contends the trial court abused its discretion by allowing Rolando's conditional examination since the supporting documentation was insufficient under California law to establish its necessity. And therefore, he contends, Cotton could not testify about Rolando's DNA test results without violating the confrontation clause. This final claim is meritless. Although Rolando's testimony should not have been admitted, under our Supreme Court's most recent interpretation of the confrontation clause there was no reason to exclude Cotton's testimony.

16

(1) *Rolando's testimony should not have been admitted.*

Revill challenges the competency of the out-of-state declaration purporting to establish the medical basis for taking Rolando's conditional examination. Revill argues the declaration executed in Virginia by Rolando's doctor failed to satisfy Code of Civil Procedure section 2015.5 because, instead of saying it had been " 'certified or declared'. . . 'under the laws of the State of California,' " it merely said: "I declare under penalty of perjury that the above [statement] is true and correct . . . ." Revill's argument is well-taken.

In *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, our Supreme Court noted Code of Civil Procedure section 2015.5 provides that an unsworn declaration executed outside of California must include, as one of its four elements, "a statement that such certification or declaration occurs '*under the laws of the State of California.*' (Italics added.) Nothing suggests that the fourth item is pointless or optional. To the contrary, courts may not excise words from statutes." (*Kulshrestha, supra,* at p. 611.) *Kulshrestha* concluded "out-of-state declarations offend section 2015.5, and are not deemed sufficiently reliable for purposes of that statute, unless they follow its literal terms," and that "a declaration is defective under section 2015.5 absent an express facial link to California or its perjury laws." (*Id.* at pp. 611, 612.)

Rather than challenge Revill's legal argument on this point, the Attorney General argues it is moot because Cotton's testimony was proper even without Rolando's testimony: "Dr. Cotton, as an expert, was entitled to rely on DNA tests performed [by] Rolando, or anyone else or tests that were completely automated, in rendering her expert opinion as to the DNA found at the crime scene. . . . Accordingly, because it is based on the erroneous premise [that] Rolando's testimony was one of the necessary 'bridges' to Dr. Cotton's testimony, appellant's [claim] is without merit." We agree with the Attorney General.

17

(2) *Laboratory testing and the confrontation clause.*

As we have explained, *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354], established a new confrontation clause test focusing "on the 'testimonial or nontestimonial nature' of the out-of-court statement. *Crawford* held that '[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.' [Citation.] Thus, out-of-court *testimonial* statements are admissible only when the witness is unavailable and there has been a prior opportunity for cross-examination of that witness. [¶] *Crawford* declined to define the term 'testimonial' [citation], but gave examples of testimonial statements. *Crawford* listed as testimonial: (1) plea allocutions showing the existence of a conspiracy; (2) grand jury testimony; (3) prior trial testimony; (4) ex parte testimony at a preliminary hearing; and (5) statements taken by police officers in the course of interrogations. [Citation.]" (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 172.)

In *Williams v. Illinois* (2012) 132 S.Ct. 2221 [183 L.Ed.2d 89], the U.S. Supreme Court's most recent case discussing *Crawford*, the prosecution DNA expert was a forensic specialist working at the Illinois State Police laboratory. This witness "testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner's blood. On direct examination, the expert testified that Cellmark . . . provided the police with a DNA profile. The expert also explained the notations on documents admitted as business records, stating that, according to the records, vaginal swabs taken from the victim were sent to and received back from Cellmark. The expert made no other statement that was offered for the purpose of identifying the sample of biological material used in deriving the profile or for the purpose of establishing how Cellmark handled or tested the sample. Nor did the expert vouch for the accuracy of the profile that Cellmark produced. Nevertheless, petitioner contends that the expert's testimony violated the Confrontation Clause as interpreted in *Crawford*. [¶] Petitioner's main argument is that the expert went astray when she referred to the DNA profile provided by Cellmark as having been

18

produced from semen found on the victim's vaginal swabs." (*Id*. at p. 2227 (plur. opn. of Alito, J.).)

The fundamental question posed by these facts was the following: "[D]oes *Crawford* bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify?" (*Williams v. Illinois, supra,* 132 S.Ct. at p. 2227 (plur. opn. of Alito, J.).) Justice Alito's plurality opinion in *Williams* (joined in by three other justices),[7] concluded this testimony did not violate the confrontation clause because: (a) the extra-judicial statements had not been offered to prove the truth of the matters asserted, but only as the basis for the testifying witness's opinion; and, (b) even if asserted for its truth, the primary purpose of the Cellmark report had not been to aid in the defendant's prosecution: "The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose." (*Id*. at p. 2228.) In the plurality's view, to qualify as "testimonial" the extra-judicial statement must have had "the primary purpose of accusing a targeted individual." (*Id*. at p. 2243.)

Justice Thomas's concurrence, while agreeing there was no confrontation clause violation, rejected both grounds of the plurality's rationale. He concluded that, although the evidence had indeed been admitted for its truth, and although the plurality's "primary purpose" analysis was incorrect, there was no confrontation clause violation "solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered ' "testimonial" ' " for purposes of the Confrontation Clause. (*Williams v.*

---

[7]    Justice Alito's plurality opinion was joined by Chief Justice Roberts, and Justices Kennedy and Breyer.

19

*Illinois, supra,* 132 S.Ct. at. p. 2255 (conc. opn. of Thomas, J.).) Justice Thomas explained: ". . . I have concluded that the Confrontation Clause reaches ' "formalized testimonial materials," ' such as depositions, affidavits, and prior testimony, or statements resulting from ' "formalized dialogue," ' such as custodial interrogation. [Citations.] [¶] Applying these principles, I conclude that Cellmark's report is not a statement by a 'witnes[s]' within the meaning of the Confrontation Clause. The Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained. . . . [Citation.] And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." (*Id.* at p. 2260, fn. omitted (conc. opn. of Thomas, J.).)

Justice Kagan's dissenting opinion (joined in by three other justices),[8] disagreed with both the plurality and Justice Thomas, and would have found a confrontation clause violation. Most pertinent to our analysis, the dissent characterized the primary purpose test as "a statement meant to serve as evidence in a potential criminal trial." (*Williams v. Illinois, supra,* 132 S.Ct. at p. 2275 (dis. opn. of Kagan, J.).)

The California Supreme Court has given its initial analysis of *Williams* in a trio of cases: *People v. Dungo* (2012) 55 Cal.4th 608, *People v. Lopez* (2012) 55 Cal.4th 569, and *People v. Rutterschmidt* (2012) 55 Cal.4th 650. *Lopez* summed up *Williams* this way: "Although the high court has not agreed on a definition of 'testimonial,' a review of [its] decisions indicates that a statement is testimonial when two critical components are present. [¶] First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. [Citations.] The degree of formality required, however, remains a subject of dispute in the United States Supreme Court.

---

[8]     Justice Kagan's dissenting opinion was joined by Justices Scalia, Ginsburg and Sotomayor.

20

[Citations.] [¶] Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be." (*People v. Lopez, supra,* 55 Cal.4th at pp. 581-582.)

In *Lopez*, the defendant had been charged with vehicular manslaughter while intoxicated. At trial, "criminalist John Willey of the San Diego County Sheriff's Regional Crime Laboratory testified that he had reviewed a laboratory report by his colleague, Jorge Peña, who had analyzed defendant's blood sample. (As noted earlier, Peña did not testify; the prosecution did not assert that Peña was unavailable as a witness.) Willey mentioned that, as described in Peña's report, Peña had used a gas chromatograph to analyze defendant's blood sample. The report, Willey testified, stated that defendant's blood sample contained a blood-alcohol concentration of 0.09 percent. Willey added that based on his own 'separate abilities as a criminal analyst,' he too concluded that the blood-alcohol concentration in defendant's blood sample was 0.09 percent." (*People v. Lopez, supra,* 55 Cal.4th at p. 574, fn. omitted.)

*Lopez* held there had been no confrontation clause error:

"Here, *we need not consider the primary purpose of nontestifying analyst Peña's laboratory report* on the concentration of alcohol in defendant's blood *because*, as explained below, *the critical portions of that report were not made with the requisite degree of formality or solemnity to be considered testimonial* [citation]." (*People v. Lopez, supra,* 55 Cal.4th at p. 582, italics added.) The bulk of the laboratory report "consist[ed] entirely of data generated by a gas chromatography machine to measure calibrations, quality control, and the concentration of alcohol in a blood sample. Even though nontestifying analyst Peña's signature appears on the laboratory report's second page (the printout of the machine's calibrations) and the remaining pages bear the handwritten initials 'JRP' (presumably Jorge Peña's initials), no statement by Peña, express or implied, appears on any of those pages." (*Id.* at p. 583.)

"Not yet considered by the United States Supreme Court is whether the prosecution's use at trial of a machine printout violates a defendant's right to confront

21

and cross-examine the machine's operator when, as here, the printout contains no statement from the operator attesting to the validity of the data shown. We agree with those federal appellate courts that have upheld the use of such printouts. (See *U.S. v. Moon* (7th Cir.2008) 512 F.3d 359, 362 ['the instruments' readouts are not "statements," so it does not matter whether they are "testimonial" ']; *U.S. v. Washington* (4th Cir. 2007) 498 F.3d 225, 231 ['the raw data generated by the machines do not constitute "statements," and the machines are not "declarants" ']; see also *Bullcoming* [*v. New Mexico* (2011) 131 S.Ct. 2705, 2722 (180 L.Ed.2d 610)] (conc. opn. of Sotomayor, J.) [the prosecution's introduction only of 'machine-generated results, such as a printout from a gas chromatograph,' may not violate the defendant's confrontation right].) Because, unlike a person, a machine cannot be cross-examined, here the prosecution's introduction into evidence of the machine-generated printouts shown in pages 2 through 6 of nontestifying analyst Peña's laboratory report did not implicate the Sixth Amendment's right to confrontation." (*People v. Lopez, supra,* 55 Cal.4th at p. 583.)

"Defendant argues that nontestifying analyst Peña's laboratory report is indistinguishable from the laboratory certificates that the high court determined to be testimonial in *Melendez–Diaz* and *Bullcoming*. Not so. In *Melendez–Diaz*, 'the certificates were sworn to before a notary . . .' by the testing analysts who had prepared the certificates. [Citation.] And in *Bullcoming*, the laboratory analyst's certificate regarding the result of his analysis was ' "formalized" in a signed document' that expressly referred to court rules providing for the admissibility of such certificates in court. [Citation.] Such formality is lacking here." (*People v. Lopez, supra,* 55 Cal.4th at pp. 584-585.)

Three subsequent California Court of Appeal cases have discussed this analysis by *Lopez*, and each has held that the kind of DNA testimony Dr. Cotton gave in this case does not violate the confrontation clause.

In *People v. Holmes* (2012) 212 Cal.App.4th 431, the testifying DNA experts had not personally performed the testing on which they relied in reaching their opinions. *Holmes* held: "The forensic analysis relied on by the DNA experts in this case was not

22

'testimonial' under any formulation of that term yet-adopted by a majority of the United States Supreme Court justices or by the California Supreme Court." (*Id*. at p. 433.) "Three supervising criminalists from these three labs offered opinions at trial, over defense objection, based on DNA tests that they did not personally perform. They referred to notes, DNA profiles, tables of results, typing summary sheets, and laboratory reports, that were prepared by nontestifying analysts. None of these documents was executed under oath. None was admitted into evidence. Each was marked for identification and most were displayed during the testimony. Each of the experts reached his or her own conclusions based, at least in part, upon the data and profiles generated by other analysts." (*Id*. at p. 434.)

Noting that *Lopez* had concluded "a lab analyst's unsworn report analyzing machine-generated blood alcohol concentration data lacked the requisite degree of formality to be testimonial," *Holmes* held: "The forensic data and reports in this case lack 'formality.' They are unsworn, uncertified records of objective fact. Unsworn statements that 'merely record objective facts' are not sufficiently formal to be testimonial. [Citation.] [¶] . . . [¶] It is now settled in California that a statement is not testimonial unless both criteria [i.e., formality and primary purpose] are met. In *Lopez*, the court concluded that lack of formality alone rendered the blood alcohol report nontestimonial regardless of its primary purpose. [Citation.]" (*People v. Holmes, supra,* 212 Cal.App.4th p. 438.)

In *People v. Steppe* (2013) 213 Cal.App.4th 1116, a technical reviewer testified about test results obtained by another DNA analyst. She reviewed the raw data, interpreted it, concluded the victim's DNA was on defendant's clothing, and offered a random match probability opinion. *Steppe* held: "Both *Williams* and *Lopez* persuade us that the trial court's overruling of defendant's objection was not error. There are two aspects of the technical reviewer's testimony that defendant's objection could be viewed as encompassing, i.e., her reference to the raw data and her reference to the conclusion reached by the clothing/door analyst, which was the same as the conclusion she reached. As to the first, *Lopez* specifically held that a machine printout is not subject to

23

confrontation analysis. Here, it was never established how the raw data was generated, or by whom. Defendant cites no authority that testimony concerning raw data, by an expert subject to cross-examination, violates the confrontation clause." (*Id*. at p. 1126.) Regarding "the second aspect, the technical reviewer's reference during her testimony to the conclusion reached by the clothing/door analyst . . . as a general matter, as both *Williams* and *Lopez* concluded, such lab reports, containing these conclusions, lack the degree of formality and solemnity to be considered testimonial for purposes of the confrontation clause." (*Id*. at pp. 1126-1127.)

In *People v. Barba* (2013) 215 Cal.App.4th 712, a Cellmark lab director, who had not personally done the DNA testing, testified on the basis of "performing technical reviews of case folders created by the lab's test analysts [and] independently drawing conclusions from the test results based on her own expertise and training . . . ." (*Id*. at p. 718.) *Barba* found no confrontation clause error: "We believe that a majority of [the United States Supreme Court] would approve of an affirmance here for two reasons. Justice Thomas would approve because DNA reports lack the solemnity and formality required to be deemed testimonial. The plurality would approve because, at least as we read the opinion, DNA test reports are not testimonial in part due to practical considerations, and in part because their primary purpose is not to accuse a targeted individual. The former rationale squares with at least part of our analysis in [an earlier opinion], where we distinguished the Cellmark DNA reports from the affidavit-like documents at issue in *Melendez-Diaz* and *Bullcoming*." (*Id*. at p. 742.) "[I]t makes no sense to exclude evidence of DNA reports if the technicians who conducted the tests do not testify. *So long as a qualified expert who is subject to cross-examination conveys an independent opinion about the test results, then evidence about the DNA tests themselves is admissible*." (*Id*. at p. 742, italics added.)

(3) *There was no confrontation clause violation here.*

Although the precise analyses in *Holmes, Steppe* and *Barba* differ slightly, they all conclude that, under *Lopez,* the kind of DNA testimony offered by Cotton did not violate the confrontation clause. We have examined the data tables cited by Cotton in her

testimony about the DNA discovered beneath Kimberley's fingernails (People's exhibits No. 192 and No. 193), as well as People's exhibit No. 5, the Cellmark "Report of Laboratory Examination" from which those tables were taken. Although Rolando's signature appears on the report (as does the signature of Lewis Maddox, Laboratory Director), there are no certifications, avowals, or statements attesting to the accuracy of the report's test results and conclusions.

Revill argues that, because "Cotton admitted that she did not do any of the testing or lab work but only reviewed Rolando's reports . . . under *Melendez-Diaz* and *Bullcoming*, [she] could not testify about Rolando's test results." Not so. *Melendez-Diaz* prohibited the use of "certificates of analysis" to show that a substance seized from the defendant was cocaine. "The certificates were sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health, as required under Massachusetts law. [Citation.]" (*Melendez-Diaz v. Massachusetts, supra,* 557 U.S. at p. 308.) These documents, "while denominated by Massachusetts law 'certificates,' are quite plainly affidavits . . . incontrovertibly a ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact." ' [Citation.]" (*Id*. at p. 310.) Moreover, "the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance [citation]." (*Id*. at p. 311.) *Bullcoming* prohibited blood test results in a driving under the influence case where the prosecution's blood-alcohol analysis lab reports "[i]n all material respects . . . resemble[d] those in *Melendez-Diaz*." (*Bullcoming v. New Mexico, supra,* 131 S.Ct. at p. 2717.) The state laboratory's "report form contain[ed] a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses." (*Ibid*.)

The laboratory reports at issue here, on the other hand, are in the form of letters addressed to the law enforcement agency that submitted the evidence to be tested. The reports do not purport to be an official certification of the test results for court purposes. Besides reporting the results of the DNA testing, the reports merely advised the submitting law enforcement agency that, "If expert witnesses are needed for depositions

25

or court testimony, please notify us by telephone at (301) 515-6125 at least four weeks in advance." As our Supreme Court held in *Lopez*: "[W]e need not consider the primary purpose of [the DNA lab reports] . . . because . . . the critical portions . . . were not made with the requisite degree of formality or solemnity to be considered testimonial [citation]." (*People v. Lopez, supra,* 55 Cal.4th at p. 582.)

Moreover, Dr. Cotton had been a lab director and technical reviewer for Cellmark at the time this testing was done; indeed, she had been the technical supervisor for some of the tests in this case. Her testimony about the fingernail evidence, for instance, not only demonstrated how to analyze the data generated by the automated test procedures, but also offered her independent opinion as to what the fingernail DNA evidence showed.

Revill pretty much ignores our Supreme Court's decision in *Lopez*, choosing instead to focus on an opinion by the Delaware Supreme Court, *Martin v. State* (2013) 60 A.3d 1100, for the proposition that "a lab supervisor could not testify about a blood analysis that she neither conducted nor observed without violating the defendant's confrontation rights." However, not only is *Martin* an out-of-state case, but *Martin* acknowledged *Lopez* only to the extent of citing Justice Liu's dissenting opinion (*id*. at p. 1104, fn. 35), and the only non-Delaware case in which it is cited, an opinion by the Colorado Supreme Court in *Marshall v. People* (2013) 309 P.3d 943, was unimpressed, saying: "[W]e simply disagree with the court's reasoning in *Martin.*" (*Id*. at p. 947, fn. 8.)

Hence, it does not matter if the evidence from Rolando's conditional examination was improperly admitted because Cotton's testimony did not violate the confrontation clause.

3. *Trial court did not err by denying severance*.

Revill contends the trial court erred by denying his motion to sever the murder charges (counts 1 and 2) from the drug charges (counts 3 and 4) and from the aggravated assault charge (count 5). This claim is meritless.

26

a. *Background.*

Initially, Revill only sought to sever the aggravated assault charge from the murder charges. The trial court denied this request on April 29, 2005, finding consolidation was proper. The trial court pointed out the assault and murder counts were properly joined because they were the same class of crime and, in addition, there seemed to be "an enormous amount of cross-admissible evidence." In addition to the social security card belonging to Kimberley's estranged husband, which was found in Revill's possession when he was arrested for the assault and which linked him to the murders, both incidents appeared to involve drug-fueled violence, threatened or actual, with knives. The trial court reasoned: "[A]n inference is going to be drawn that from the time of the murder, which everyone conceded . . . is a very grisly murder, it appears that the defendant arguably begins to decompensate because of what's happening, and he's becoming bizarre."

The severance issue was subsequently raised anew when Revill obtained new trial counsel after the Public Defender declared a conflict of interest. New counsel sought severance of the murder counts from all the other charges, and the parties agreed the trial court could reconsider its prior ruling denying severance as to count 5. To rebut the obvious motive connection between the Glendale drug charges and the murders, defense counsel argued there was no evidence Revill actually knew Davodian had been involved in his drug arrest. On December 10, 2010, the trial court disagreed, concluding there was sufficient circumstantial evidence for the jury to find Revill had reason to suspect Davodian had set him up.

b. *Legal principles.*

"Section 954 governs the issue of joinder of counts and it provides in pertinent part: 'An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of *the same class of crimes or offenses*, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried

27

separately or divided into two or more groups and each of said groups tried separately.' (Italics added.) . . . [¶] [If t]he statutory requirements for joinder [are] satisfied, defendant ' "can predicate error in denying the motion only on a clear showing of potential prejudice. [Citation.] We review the trial court's ruling on the severance motion for abuse of discretion." [Citations.]' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 924-925.)

"The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial. Thus, refusal to sever may be an abuse of discretion where '(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all; and (4) any one of the charges carries the death penalty.' [Citation.]" (*Frank v. Superior Court* (1989) 48 Cal.3d 632, 639.) Section 954.1 specifically provides that cross-admissibility is not required: "[E]vidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." On the other hand, "[i]f the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*People v. Soper* (2009) 45 Cal.4th 759, 774-775; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 985 ["complete cross-admissibility is not necessary to justify the joinder of counts"].)

Review of the trial court's ruling must be based on the showings made, and the facts known, when the ruling was made. (*People v. Mason* (1991) 52 Cal.3d 909, 933.) But even if the ruling was correct when made, reversal is required if joinder actually resulted in gross unfairness amounting to a denial of due process. (*People v. Arias* (1996) 13 Cal.4th 92, 127.)

28

c. *Discussion.*

Revill argues "the drug counts were neither of the same class nor connected together in their commission with the assaultive crimes." However, although not of the same class, the drug charges and the murders were connected in their commission because Revill suspected he might have been set up for the Glendale drug arrest, and Davodian was the most logical culprit. It is well-recognized that evidence of motive can provide the connection necessary to justify consolidation. (See *People v. Valdez* (2004) 32 Cal.4th 73, 119 ["Although the murder itself occurred almost two years prior to defendant's escape, the offenses were nonetheless connected because the escape occurred as defendant was being returned to 'lock-up' following his arraignment on the murder charge. The apparent motive for the escape was to avoid prosecution for the murder."]; *People v. Ghent* (1987) 43 Cal.3d 739, 758-759 [consolidation proper where thwarted attempt at sexual assault was cross-admissible to show defendant's motive for subsequently attacking second victim]; *People v. De La Plane* (1979) 88 Cal.App.3d 223, 249-251, disapproved on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 39, fn. 25 [common element of substantial importance under section 954 existed where motive for murdering victim arose from earlier robbery, in which murder victim had been defendant's accomplice and victim subsequently gave evidence against defendant].)

The murders and the aggravated assault are the same class of crime, and therefore consolidation was proper unless Revill can show prejudice. (See *People v. Elliott* (2012) 53 Cal.4th 535, 551 [capital murder and assault with a deadly weapon were crimes of same class under section 954].) But Revill cannot demonstrate prejudice because the inflammatory charges were the murders, not the assault, and the weak case was the assault (on which the jury could not reach a verdict) not the murders. Moreover, as the trial court pointed out, there was some cross-admissible evidence. In addition to Revill's possession of the extremely incriminating Social Security card, the knife assault on Tanitkan apparently showed Revill acting violently as a result of a methamphetamine-induced paranoia. Indeed, Revill himself acknowledges the similarity between the two incidents. In the context of arguing inflammatory prejudice, Revill conceded "the

29

evidence of the bloody double murders was inflammatory," but then asserted "*the Thanksgiving incident* was also inflammatory because it *involved bizarre, raving and knife-wielding behavior.*"  (Italics added.)

The trial court did not abuse its discretion by denying Revill's severance motion.

4. *Trial court did not err by admitting motive evidence.*

On January 25, 2011, there was a pretrial hearing on Revill's motion to exclude any evidence showing Davodian had set him up for the Glendale drug arrest.  Revill argued the prosecution should not be allowed to try to show the arrest had given him a motive for murder because there was no evidence he actually believed Davodian informed on him.  We conclude the trial court properly denied this motion.

a. *Background*.

Maribel Ortega-Sumner, a Glendale police officer, testified she was working in the vice narcotics unit in June 2001, when she arrested Davodian after a search of his home uncovered methamphetamine and Ecstasy, drug trafficking paraphernalia, and $2,440 cash.  Ortega-Sumner gave Davodian the opportunity to earn leniency by informing on other drug sellers.  Davodian said he could contact someone and arrange to buy drugs, and Ortega-Sumner watched him make a call to "Neil" and order some Ecstasy pills.  Davodian told Neil to meet him "[i]n the city of Glendale on Pacific just north of the 134 freeway."  Davodian told Ortega-Sumner that Neil would be driving a white BMW, information she conveyed to the patrol officer who made the traffic stop and then arrested Revill for transporting drugs.

Bloomquist testified Revill said there was something fishy about the Glendale drug arrest and that it could have been a set up.  However, Revill did not say he suspected Davodian of setting him up.

b. *Discussion*.

"Of course, only relevant evidence is admissible.  (Evid. Code, § 350.)  Sometimes the relevance of evidence depends on the existence of a preliminary fact.  (Evid. Code, § 403, subd. (a); 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1718, p. 1677; see, e.g., *People v. Collins* (1975) 44 Cal.App.3d 617 . . . [identity of

30

person who made threatening telephone call to witness is preliminary fact proponent of offered testimony has burden of establishing before fact of telephone call is relevant].) The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.' [Citations.] The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion. [Citations.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 466.)

Citing *People v. Tafoya* (2007) 42 Cal.4th 147, Revill argues the prosecution should not have been allowed to pursue its motive theory because there was insufficient evidence of a necessary preliminary fact, i.e., his knowledge that Davodian had informed on him. But Revill's reliance on *Tafoya* is misplaced. There, the defense wanted to present evidence that Gattenby, a prosecution witness, had a reputation for dangerousness and was associated with the murder victims, on the ground this would support a self-defense theory. However, defense counsel made no offer of proof that defendant was aware of Gattenby's dangerous reputation. *Tofoya* concluded: "As the trial court indicated, evidence that Gattenby was dangerous was relevant to defendant's claim of self-defense only if defendant knew of Gattenby's reputation for dangerousness and was afraid of him. [Citation.] Defendant, however, presented no evidence that he knew of Gattenby's reputation for dangerousness or of Gattenby's association with [the] murder victims . . . . No evidence was presented at trial that Gattenby acted in an aggressive manner toward defendant or [his] codefendant . . . . Under these circumstances, evidence of Gattenby's reputation for being dangerous was not relevant to defendant's claim of self-defense." (*Id*. at pp. 165-166.)

But *Tafoya* is inapposite because here there were sufficient preliminary facts. Revill had been arrested while on his way to deliver drugs to Davodian, at Davodian's request, and at a location chosen by Davodian. In this situation, it is reasonable to assume Revill might well have suspected he had been set up by Davodian. It did not take a rocket scientist to figure this out. Hence, there was a sufficient evidentiary basis for the prosecution's theory that Revill had a revenge motive for killing Davodian.

31

Attempting to rebut this inference, Revill cites evidence showing Ortega-Sumner had taken steps to protect Davodian's identity.[9] But this cannot overcome the common sense conclusion that Davodian was the most logical culprit. As the prosecutor argued to the trial court: "The foundation basis is very clear. It's the fact that it was victim Mr. Davodian that made a phone call to Mr. Revill to bring some drugs and to deliver a shipment of drugs . . . to a certain location at a certain time, and when Mr. Revill goes to that location, as directed by Mr. Davodian, he is pulled over by the police." And as the trial court said when it denied Revill's motion: "The question is, is there reasonable inferences that can be drawn? You don't have to show that he knew. The question is, is there a reasonable inference that he suspected it. If there is nothing there, I agree with you that *Tafoya* would control, but you have more than that in this case."

We agree. The trial court did not abuse its discretion by allowing the prosecution to present this revenge-motive theory.

5. *Trial court did not err by striking testimony as speculative*.

Revill contends his murder convictions must be reversed because the trial court erroneously excluded evidence tending to show Revill believed he was not going to be prosecuted on the Glendale drug charges. This claim is meritless.

a. *Background*.

Tanitkan testified that sometime during the summer of 2001, he saw Kara Horn and Jennifer Dixon helping Revill use the Internet to research the status of his drug case:

"Q. And were Kara and Jennifer and Neil able to find out whether there was a case or whether Neil had to go to court?

"A. There was no case. I think they couldn't find anything.

---

[9]     Ortega-Sumner testified she did not inform the officer who made the traffic stop that she had been using an informant, and this information was not revealed in any document related to Revill's arrest. In addition, Davodian himself was booked under a false name.

"Q. And . . . they discussed the fact that it was dismissed or they thought it was dismissed[?].

"A. Something like that.

"[The prosecutor]: If I may, I'm not following, but I think the objection is hearsay in this matter.

"[Defense counsel]: State of mind.

"[The prosecutor]: His state of mind?

"The Court: What is the relevance?

"[Defense counsel]: Mr. Revill's state of mind."

The following colloquy then occurred at sidebar:

"The Court: What is the relevance of Mr. Revill's state of mind?

"[Defense counsel]: If he thought the case was dismissed he wouldn't have any motive to try to kill somebody that set him up.

"The Court: Not necessarily. That is absolutely false.

"[Defense counsel]: I think it's certainly a reasonable inference."

Saying, "I disagree that gives him a reason not to be angry," the trial court granted the prosecution's motion to strike the testimony.

After Tanitkan finished testifying, the defense asked the trial court to reconsider its ruling "because the proffered evidence substantially undermined the alleged motive. Whether or not the result of the Internet search was true, the jury could infer that appellant was not so upset with Davodian as to murder him." The trial court said: "The reason my ruling stays the same is because you are asking to speculate that because they didn't find anything on the search, that, therefore, Mr. Revill's state of mind would have been that he didn't have a motive, and that's all speculation . . . ." "I understand your reasoning. I find that it's based on total speculation and, therefore, the state of mind exception is not applicable."

  b. *Discussion*.

" '[E]vidence which produces only *speculative* inferences is *irrelevant* evidence.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 682; see, e.g., *People v. Clark*

(2011) 52 Cal.4th 856, 924 [error to admit testimony from defendant's domestic partner that they had not been sexually active during the two weeks prior to a sexual assault/murder: "To infer from such testimony that at the time of the crimes defendant was sexually frustrated and thus motivated to rape [the victim] was highly speculative and thus irrelevant."].) A trial court has wide discretion to determine relevance and decide that some evidence is "too speculative to be relevant." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1260.)

The trial court here decided the evidence was too speculative because, even if Revill believed his drug case had been dismissed, he might well have still harbored a revenge motive against Davodian. As the Attorney General argues, "[T]he theory was that regardless of what happened with the pending case, appellant's friend Davodian had betrayed him by setting him up to be arrested on his way to a narcotics transaction arranged by Davodian himself. Regardless of whether the charges were still pending, the underlying motive – betrayal by his good friend – would nevertheless have remained." We cannot say the trial court abused its discretion by excluding this evidence on the ground Revill was asking the jury to speculate he might no longer be angry at Davodian because, although Davodian had betrayed him, Revill would not be facing criminal charges.

Moreover, any error in excluding this evidence would have been harmless. (See *People v. Edwards* (2013) 57 Cal.4th 658, 726 ["even assuming the trial court erred in sustaining the prosecutor's objections to this [state of mind] testimony, there was no possible prejudice"].) Not only was this evidence so weak it was unlikely to convince the jury Revill no longer had a motive for killing Davodian, but the evidence of Revill's confession to Chloupek presented an entirely different motive for the killings that had nothing to do with the Glendale drug arrest.

6. *Trial court did not err by placing restrictions on the defense cross-examination of Bloomquist.*

Revill contends the trial court erred by restricting the scope of his proposed cross-examination of Bloomquist, which was intended to impeach his testimony that Revill

suspected his drug arrest had been a set up. Revill argues, "The reality is that Bloomquist was a major drug dealer and that he, rather than appellant, in fact believed Davodian was an informant. Nevertheless the trial court denied cross-examination to expose this." This claim is meritless.

a. *Background.*

This issue initially arose before Bloomquist took the stand. The prosecution asked the trial court to limit Bloomquist's testimony to the fact Revill believed there was something suspicious about the Glendale drug arrest. The prosecutor feared that without some formal boundary the defense would try to sneak in an improper third-party culpability theory. Defense counsel argued the prosecution was trying to sanitize Bloomquist's character. The trial court ruled it would sustain objections to questions outside the scope of direct examination. The court also advised the defense to decide if it would be presenting third-party culpability evidence because there were certain evidentiary tests that had to be met.

Bloomquist took the stand and testified that, after Revill was released from custody in Glendale, he told Bloomquist there was something fishy about his arrest. On cross-examination, defense counsel asked Bloomquist about his prior convictions and then asked if he knew Davodian. Bloomquist said he and Davodian had hung out a few times and done drugs together. When defense counsel asked what kind of drugs, the prosecutor objected to the question as "[b]eyond the scope and irrelevant."

At sidebar, the trial court sustained the objection, noting that on direct examination Bloomquist had only been asked about a single conversation in which Revill said he was suspicious about the arrest. The defense argued it was entitled to show Bloomquist had lied about this. The trial court was concerned about improper third-party culpability evidence and asked for an offer of proof. The defense proffered Bloomquist and Revill had been in the drug business together, that after talking to Revill about the Glendale arrest Bloomquist confronted Davodian about being an informant, and that Bloomquist was now falsely attributing his own suspicions about Davodian to Revill in order to deflect attention from himself as a suspect.

35

At the trial court's direction, Revill filed a motion containing a formal offer of proof to support the proposed cross-examination of Bloomquist. This motion included as exhibits DEA reports relating to an investigation of Bloomquist's drug trafficking network and the transcript of a police interview with Bloomquist. Revill argued there was evidence showing Bloomquist was part of a violent drug trafficking network which had supplied Davodian with Ecstasy, that the network planned to use violence against informants and people who owed them money, that Bloomquist had tried to get someone to murder a suspected informant, and that Davodian had called Bloomquist three times the night he was killed.

The trial court ruled Bloomquist's cross-examination would be limited to three subjects: (1) how Bloomquist knew Davodian and whether they trafficked drugs together; (2) the circumstances in which Revill told Bloomquist he was suspicious about the Glendale arrest; and, (3) whether the first time Bloomquist ever mentioned this conversation was during his custodial interrogation by the police.

b. *Legal principles.*

" 'While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. [Citations.] . . . [¶] 'A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. [Citations.]' " (*People v. Gonzales, supra,* 54 Cal.4th at p. 1259.)

"To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another

36

person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833.)

c. *Discussion.*

Revill denies he was trying to raise a reasonable doubt by showing Bloomquist might have committed the murders. Certainly the evidence was insufficient to meet the *Hall* test for admission of third-party culpability evidence as Revill did not have "direct or circumstantial evidence linking [Bloomquist] to the actual perpetration of the crime." (*People v. Hall, supra,* 41 Cal.3d at p. 833.) The problem for Revill is that every other reason he gives for admitting this evidence is either plainly wrong or completely insignificant in view of the overwhelming evidence of his guilt.

Revill argues his proposed cross-examination would have shown that Bloomquist and his network supplied Davodian with Ecstasy, that Bloomquist believed Davodian was an informant and confronted him about this, that Bloomquist called Davodian after Revill's arrest and on the night before Davodian's murder, and that Bloomquist falsely testified Revill was suspicious Davodian had informed on him "to avoid scrutiny of [Bloomquist's] own drug-dealing network and belief that Davodian was an informant."

But an exploration of Bloomquist's drug trafficking operation without any evidence linking Bloomquist to Davodian's murder would have amounted to impeachment on a collateral matter and raised the attendant problems of holding a trial within a trial. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 625 [trial court did not abuse discretion by excluding impeachment on collateral matter]; *People v. Wheeler* (1992) 4 Cal.4th 284, 296-297.) ["[I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value."].) "[T]he consumption of time and the risk of jury distraction were not justified by the marginal probative value of the proffered evidence. Nor, contrary to [Revill's] assertion, was the evidence of such probative

37

strength that its exclusion violated his constitutional right to present a defense. Application of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense [citation]; certainly the marginal probative value of this evidence does not take it outside the general rule." (*People v. Snow* (2003) 30 Cal.4th 43, 90; see also *People v. Hayes* (1999) 21 Cal.4th 1211, 1266 & fn. 15 [disallowing impeachment of prosecution witness on collateral matter did not restrict defendant's right to confrontation and cross-examination].)

There was no reason Revill should have been allowed to put on all this evidence just to impeach Bloomquist's testimony about Revill saying there was something fishy about the Glendale arrest. As discussed *ante*, it was obvious the arrest had been suspicious. Moreover, there was no shortage of alternative motives in this case. Revill's confession to Chloupek provided an entirely different motive theory: that Revill feared Davodian was setting him up to be killed. Beyond that, the circumstantial evidence itself suggests the murders could have been perpetrated in the course of a robbery because a known drug dealer was found dead and his residence had apparently been emptied of all drugs and money. The probative value of Revill's proposed impeachment evidence was entirely overshadowed by the relative insignificance of the claims he wanted to make.

Finally, there could not have been any resulting prejudice. There was overwhelming evidence Revill was the person who murdered Davodian and Kimberley. Entirely apart from his confession to Chloupek, the DNA evidence (particularly that found in the blood on Kaylee's dress and underneath Kimberley's fingernails) put Revill right in the middle of the murderous violence. Additionally, much circumstantial evidence corroborated Revill's guilt, including: his sudden acquisition of money; the injuries to his face and head which were consistent with having been in a violent struggle and were first seen by others in the aftermath of the murders; the dried blood/rigor mortis/lividity evidence, which contradicted the alibi testimony of Gregorian's downstairs neighbor; the consciousness of guilt evidence manifested by his "I've done

38

something evil" and "I need to go to jail" comments; and, particularly incriminating, his possession of a Social Security card which had apparently been stolen from Kimberley.

As a result, we reject all of the following claims associated with the issue of restricting Revill's cross-examination of Bloomquist: that his proposed cross-examination was not outside the scope of the prosecutor's direct examination; that it was proper impeachment evidence; that it was not barred by Evidence Code section 352; that any concerns about improper third-party culpability evidence could have been cured by a limiting instruction; and, that the restriction on Bloomquist's cross-examination violated due process.

7. *Trial court did not err by refusing to strike evidence about Tanitkan discovering a knife*.

Revill contends the trial court erred by refusing to strike Tanitkan's testimony about discovering a knife behind his VCR on December 25, 2001. This claim is meritless.

a. *Background*.

During the cross-examination of Tanitkan, defense counsel asked:

"Q. And when you called the police . . . on November 27th, you called . . . because you had read something about the murders . . . in the paper, right?

"A. It's either that or I called them due to the fact that I found a knife in my house. . . .

"Q. But the reason – I mean you called them with some possible information on the murder of Mr. Davodian?

"A. I don't recall why I called. I just remember I found a knife in my house behind the VCR, wrapped in a piece of cloth, and I think I might have called because of that reason, for them to come and pick it up.

"Q. Because you thought – you didn't think it was your knife?

"A. It wasn't mine or Kara's. I mean, who was coming in my house, in and out? So I thought it might be related because there was blood on it, and now I know there is a

39

murder case, and I'm finding a . . . bread knife with blood on it, so I thought it might be evidence or related to it."

After Tanitkan left the stand, defense counsel asked the trial court to strike this testimony about finding a knife (hereafter, the "VCR knife") because both parties knew there was no evidence showing this knife had anything to do with the killings. The trial court decided the best way to deal with the fact defense counsel had failed to object while Tanitkan was still testifying was either to have the parties enter a stipulation, or allow Revill to put on evidence showing the knife was irrelevant.

The parties subsequently stipulated "that on December 25, 2001, Ersen Tanitkan contacted the LAPD and reported finding a knife at the residence he shared with Kara Horn. LAPD took custody of that knife on December 27, 2001, and booked it as item 192." Revill introduced testimony from a criminalist at the LADP crime lab, who testified the knife had tested negative for blood and there were no fingerprints on it.

b. *Discussion*.

Citing *People v. Archer* (2000) 82 Cal.App.4th 1380, which Revill characterizes as a case that "under nearly identical circumstances . . . found evidence of an unrelated knife in a decapitation case irrelevant and inadmissible," Revill contends Tanitkan's testimony about the VCR knife should have been stricken. But in *Archer* the prosecutor presented evidence of nine knives, only two of which had any relevance to the case: " 'Evidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons – a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant.' [Citation.] Admission of the knives other than the two which had some arguable relevance to the case created a risk of that same inference in this case. The court abused its discretion in overruling appellant's objection." (*Id*. at pp. 1392-1393.)

In the case at bar, however, there was testimony about only one irrelevant knife and that testimony had been elicited by defense counsel. Certainly this testimony had been elicited inadvertently; the issue was how best to remedy the situation. The trial

40

court opted for a stipulation and allowing Revill to put on evidence showing the VCR knife had nothing to do with the killings. Nevertheless, Revill argues: "By failing to strike the evidence of the VCR knife, the trial court permitted the jury to draw an improper inference. Tanitkan testified that the knife did not belong to him or to his wife. He added that he called the police about the knife because appellant was periodically going in and out of the apartment and he thought it related to the murder. The jury would therefore have inferred, as Tanitkan himself did, that appellant hid the murder weapon at the apartment after the crimes." But the jury also learned that what Tanitkan thought was blood on the knife had tested negative, and the prosecution did not try to prove this knife was the murder weapon. Evidence of this single knife would hardly have created the problem at issue in *Archer*, where the jury was shown an entire array of irrelevant knives. In addition, Revill's jury heard evidence about a far more lethal weapon: the .45-caliber semiautomatic with hollow point bullets found in the car he was driving during the Glendale drug arrest.

Given all these circumstances, the trial court did not err by refusing to strike Tanitkan's testimony about the VCR knife.

8. *Jury was not improperly instructed on the definition of reasonable doubt.*

Revill contends the jury was misinstructed on the reasonable doubt standard because the trial court failed to correct certain statements the prosecutor made during voir dire. This claim is meritless.

a. *Background.*

During voir dire, the prosecutor talked to the prospective jurors about the difference between "reasonable" and "possible." The prosecutor began: "I want to talk to you a little bit about the burden of proof, and I want to ask you a question now which basically handles a couple of concepts: what is possible and what is reasonable. Okay. You heard that the burden of proof is beyond a reasonable doubt. [¶] So I think I am going to ask Juror Number 7, do you know what the difference [is] between something that's reasonable versus something that's possible?" When the prospective juror answered "No," the prosecutor asked, "Now . . . because the standard is reasonable doubt,

41

which type of evidence do you think you are to consider as a juror, that which is reasonable or that which is possible?"  The juror answered, "I would say possible."

Defense counsel objected at this point and the trial court intervened by saying, "Well, what I will do at this point, I will read the reasonable doubt instruction. . . .  [¶] This is the reasonable doubt instruction, ladies and gentlemen.  There's no variations from it.  You will find sometimes in interpreting instructions judges will try to come up with their own attempt to explain something using their own language, but there is one place that isn't done and that is when defining reasonable doubt, there is one standard, the language means what the language says, and that's sort of it . . . ."  The trial court then read CALCRIM No. 220, the standard reasonable doubt instruction, to the prospective jurors.

After the trial court finished reading the instruction, the prosecutor continued the voir dire by asking:  "Now, that you have heard the instruction on reasonable doubt, you see there's differences between what is reasonable and what is possible . . . ?"  When Prospective juror No. 7 answered, "Sort of," the prosecutor proceeded to give an example about driving very carefully through a busy intersection and realizing that, although it was reasonable to assume you would be safe as long as you drove properly, it was also possible someone could run a red light and hit your car.  The prosecutor then proposed that, upon seeing a commercial airliner up in the sky it would be reasonable to assume the plane had a pilot, but at the same time one accepts the possibility the plane is being flown by some kind of non-human automatic pilot.

Defense counsel objected again, saying the prosecutor was "really misapplying the standard of reasonable doubt to every day decisions like driving."  The trial court overruled the objection:  "I think it's just trying to explore reasonable and possible, it's not going over the line at this point."

b. *Discussion*.

Revill points to the well-settled rule that the reasonable doubt standard is not the same standard people use for making decisions in everyday life, and argues the prosecutor's analogies to "driving and air travel" were improper. But the cases Revill cites are ones in which the *trial court* made the offending analogies. (See *People v. Johnson* (2004) 119 Cal.App.4th 976, 979; *People v. Johnson* (2004) 115 Cal.App.4th 1169, 1171.) That is very different from the case at bar, where the analogies were made by the prosecutor and the trial court intervened to clarify any ambiguity by reading CALCRIM No. 220. Revill does not contend the trial court itself misinstructed the jury on the definition of reasonable doubt.

Moreover, the offending analogies in those cases actually *equated* the reasonable doubt standard to the making of everyday decisions. (See *People v. Johnson, supra,* 119 Cal.App.4th at pp. 982, 983 [trial court said "jurors are not to 'pass a moral judgment' but are simply to make the 'kind of decisions you make every day in your life,' and "that jurors who find an accused person guilty or not guilty engage in the same decisionmaking process they 'use every day. When you get out of bed, you make those same decisions.' "]; *People v. Johnson, supra,* 115 Cal.App.4th at p. 1171 [trial court said: "We take vacations; we get on airplanes. We do all these things because we have a belief beyond a reasonable doubt that we will be here tomorrow . . . to go to Hawaii on a vacation."].)

Here, the prosecutor did not equate finding the defendant guilty with making a decision to get on an airplane[10] or drive a car. The prosecutor was merely trying to explain the difference between the word "possible" and the word "reasonable." The standard reasonable doubt instruction contains numerous references to both "reasonable"

---

[10] Indeed, the prosecutor's airplane analogy had nothing to do with deciding to take a trip; rather, it asked whether it was "probable" or merely "possible" that an airplane flying overhead might not have a human pilot.

43

and "possible,"[11] and we see no impropriety in the prosecutor attempting to educate prospective jurors about the difference between the two concepts.

The jury was not misinstructed on reasonable doubt.

9. *Cumulative error.*

Revill contends the cumulative prejudicial effect of the various trial errors he has raised on appeal requires the reversal of his conviction. However, we have found at most only a few insignificant errors that were clearly harmless. Revill's trial was not fundamentally unfair. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1056 ["Defendant contends the cumulative prejudicial effect of the various errors he has raised on appeal requires reversal of the guilt and penalty judgments. We have rejected his assignments of error, with limited exceptions in which we found the error to be nonprejudicial. Considered together, any errors were nonprejudicial. Contrary to defendant's contention, his trial was not fundamentally unfair, even if we consider the cumulative impact of the few errors that occurred."].)

---

[11]    As the trial court here instructed:  "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. The defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a *reasonable doubt*. Whenever I tell you the People must prove something, I mean they must prove it beyond a *reasonable doubt,* unless I specifically tell you otherwise. [¶] Proof beyond a *reasonable doubt* is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all *possible doubt* because everything in life is open to some *possible or imaginary doubt*. In deciding whether the People have proved their case beyond a *reasonable doubt*, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a *reasonable doubt*, he is entitled to an acquittal and you must find him not guilty." (Italics added.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.

45